# UNITED STATES DISTRICT COURT
# DISTRICT OF ALASKA

| | |
|---|---|
| Charles Gebhardt, Liquidating Trustee of Miller Energy Creditors Liquidating Trust, substituted for Cook Inlet Energy,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Cudd Pressure Control, Inc., and RPC, Inc.,<br><br>　　　　Defendants. | 3:13-CV-00062 JWS<br><br>**ORDER AND OPINION**<br><br>[Re: Motion at docket 141] |

## I. MOTION PRESENTED

At docket 75, former plaintiff Cook Inlet Energy ("CIE") filed a motion for partial summary judgment as to its material breach-of-contract claim (Count 2) and breach-of-implied-and-express-warranties claim (Count 5) against Defendants Cudd Pressure Control, Inc., ("Cudd") and RPC, Inc. CIE filed its supporting memorandum and evidence at dockets 82 and 83. It argues in its motion that there are no issues of material fact as to Cudd's breach claims and all that is left to determine is the amount of damages. Cudd filed a response to the motion at docket 101, and CIE filed a reply at docket 108. Subsequently, the United States Bankruptcy Court for the District of

Alaska approved the joint plan of reorganization of CIE's parent company, Miller Energy Resources, Inc., and CIE's claim against Cudd was assigned to Charles Gebhardt Liquidating Trustee of Miller Energy Creditors Liquidating Trust ("Plaintiff"). At docket 120 the court dismissed the motion for summary judgment at docket 75 without prejudice to afford Plaintiff an opportunity to "proceed in whatever manner it ultimately sees fit."[1] At docket 141, Plaintiff filed a notice that it was reasserting the motion for partial summary judgment filed by CIE at docket 75. The notice also indicates that Cudd maintains its response to that motion based on its previously submitted briefing and supporting materials at docket 101 and that Plaintiff's reply at docket 108 stands as well. Oral argument was heard on November 28, 2016.

## II. BACKGROUND

CIE is an oil and gas exploration and production company. In 2009 it purchased an offshore oil and gas platform, the Osprey Platform, located in the Cook Inlet of Alaska. A prior owner of the Osprey Platform had drilled multiple oil and gas wells, but when CIE acquired the platform those wells had gone out of production and needed a "workover." A workover is the process used to maintain and repair a well and often includes the removal and replacement of casing, spent explosives, and failed electrical submersible pumps from the well. Any failed, lost, or stuck equipment in a well is referred to as "fish," and the process used to remove such items from a well is referred to as "fishing." In 2011, CIE decided to look into conducting workovers of three wells from the Osprey Platform: wells RU-1, RU-3, and RU-7. It also was considering the possibility of drilling new wells.

CIE contacted Cudd, an energy services company, about supplying a rig for the workovers. Through a series of conversations, meetings, and emails, the two companies agreed that Cudd would provide the equipment and related services to complete the three workovers. The deal primarily involved Cudd sending a special

---

[1]Doc. 120 at p. 1.

-2-

workover rig—a "Hydraulic Workover Unit" ("HWO unit")—and a crew to operate the rig from Louisiana to Alaska to perform the requested workovers on RU-1, RU-3, and RU-7. No written contract was signed. Rather, the parties formulated the deal through their communications and finalized it in mid-to-late February of 2011 when Cudd's credit department approved CIE's credit application and when Cudd's service manager for its HWO units, Bobby Bray, sent CIE's CEO an email indicating that Cudd was planning to send the rig chosen, and Hall responded "yes, please proceed." While there were discussions about the Cudd rig performing the drilling for the new wells, the parties did not come to an agreement regarding the use of the rig for that type of work.

On about April 20, 2011, after the selected HWO unit—Cudd Rig #138—arrived in Alaska and had been set up and tested, Cudd began the attempted workover of RU-3. The workover was unsuccessful despite numerous attempts and efforts to reach the "fish" in the well.[2] The workover of RU-1 was also unsuccessful; the rig was able to reach the fish but was unable to pull it out of the well. The workover of RU-7 was accomplished. While it was attempting to complete the workovers, Cudd sent invoices to CIE for its time and materials. In July, CIE paid some of Cudd's invoices, but others remain outstanding.

CIE filed its complaint in early 2013 alleging in part that Cudd breached an implied contractual warranty to perform in a workmanlike manner and an express warranty to provide a rig with a certain amount of torque capacity. The parties agree that their contract was not an "end result" one, but rather, an agreement where the Cudd rig would be used to perform the workovers on a time and material basis at the prices that CIE and Cudd had agreed upon. Therefore, Plaintiff does not contend that the unsuccessful results on the RU-3 and RU-1 workovers in and of themselves constitute a breach. However, Plaintiff claims that the unsuccessful attempts to

---

[2]In late October and early November 2012, using a Miller Energy rig, rather than a Cudd rig, CIE was able to complete the workover on RU-3. The rig CIE used was a larger drilling rig.

workover those wells were the result of Cudd's failure to perform in a workmanlike manner, either because the rig Cudd sent for the workovers was not suitable for the job based on its failure to produce the required torque or because its crew was not competent to perform the job. Plaintiff also alleges that the rig did not have the torque capabilities that were expressly represented to CIE during the parties' discussions and, therefore, Cudd also breached an express warranty in addition to the implied warranty of workmanlike performance.

Originally Cudd had filed a counterclaim for a breach of the implied covenant of good faith and fair dealing in its performance of the contract. Plaintiff sought summary judgment on that counterclaim as well. However, that claim has subsequently been dismissed pursuant to the parties' stipulation after the bankruptcy proceedings.[3] Plaintiff's request for declaratory judgment has also been dismissed as moot. The remaining claims in Plaintiff's complaint are not at issue here.

### III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[5] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6] However, summary judgment is mandated "against a party who fails to make a showing sufficient to

---

[3] Docs. 142, 146.

[4] Fed. R. Civ. P. 56(a).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

-4-

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[7]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[8] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[9] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[10] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[11] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[12]

## IV. DISCUSSION

Plaintiff argues that Cudd breached its implied warranty of workmanlike performance. This implied warranty of workmanlike performance is essentially a "particular application" of a tort negligence standard.[13] "In both instances the standard

---

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[8]*Id.* at 323.

[9]*Id.* at 323-25.

[10]*Anderson,* 477 U.S. at 248-49.

[11]*Id.* at 255.

[12]*Id.* at 248-49.

[13]*Shields v. Cape Fox Corp*., 42 P.3d 1083 (Alaska 2002) (examining a breach-of-fiduciary-duty claim based on the lack of due diligence and noting that a duty implied by law as a result of a contractual undertaking is merely a "particular application of a negligence standard").

-5-

of care is imposed by law and under either theory there is no difference in the standard of care required of the party rendering the personal services."[14] Thus, to bring a successful claim against a defendant for such a breach, there must be a duty of care applied to the contract, a showing that the defendant breached that duty of care, and a showing that the breach caused damages.

The parties do not dispute that in this federal diversity action, the court should apply Alaska substantive law. Under Alaska law, whether Cudd had a duty of care to perform in a workmanlike manner as a result of the contractual undertaking, and the scope of that duty, is a question of law for the court.[15] In Alaska, "it is well settled that, in building or construction contracts whenever someone holds himself out to be specially qualified to do a particular type of work, there is an implied warranty that the work will be done in a workmanlike manner, and the resulting building, product, etc. will be reasonably fit for its intended use."[16] Courts across the country generally apply the warranty to all contracts for work or services, not just construction contracts.[17] The warranty has been recognized where a service provider contracts to provide equipment and a crew to operate the equipment.[18] Indeed, Cudd does not argue that this implied warranty should not be applied to the agreement between itself and CIE.

The scope of the duty of care imposed by the implied warranty to perform in a workmanlike manner is "directly related to the scope of the duties and obligations

---

[14] *Pepsi Cola Bottling Co. of Anchorage v. Superior Burner Serv. Co.*, 427 P.2d 883, 840-41 (Alaska 1967).

[15] *Lindsey v. E & E Auto. & Tire Serv., Inc.*, 241 P.3d 880, 885 (Alaska 2010).

[16] *Lewis v. Anchorage Asphalt Paving Co.*, 535 P.2d 1188, 1196 (Alaska 1975).

[17] See Doc. 82 at p. 38 n.169 (setting forth a list of cases where the implied warranty of workmanlike quality has been applied to a variety of different service contracts).

[18] *Belger Cartage Serv. Constr., Inc. v. Holland Constr. Co.*, 582 P.2d 1111, 1122 (Kan. 1978).

imposed on the parties by their contract."[19]  Here, there was no formal written contract between the parties.  It is undisputed, however, that the agreement was one where Cudd was to provide a workover rig and a crew to operate that rig and that billing would be on a time and materials basis.  When a company agrees to supply equipment and workers to operate the equipment, absent an express agreement otherwise, the company impliedly warrants that the equipment will be fit for the intended use and that the crew members are skilled in how to use the equipment, will do the job in a workmanlike manner, and will exercise reasonable care in performing the work.[20]  That is to say, the implied warranty requires the service provider to furnish equipment and materials that are "suitable to perform the particular purpose" for which the services were contracted.[21]  The crew is "required to exercise that degree of care and skill in handling the job for which it was called . . . , which a reasonably prudent, skilled and qualified" service provider in the field "would exercise under the circumstances."[22]

      Plaintiff argues that Cudd failed to provide a workover rig that was suitable to perform the required tasks and, therefore, breached its implied warranty, or, alternatively, if the rig itself was sufficient, that the crew assigned to operate the rig did not do a competent job.  It argues that Cudd's rig #138 should have been able to produce 22,000 ft.-lbs. of torque, which it argues would have been sufficient to complete the well workover based on CIE's subsequent completion of the RU-3 workover with a different, albeit more powerful, rig that used about 18,000 to 20,000 ft.-lbs. to complete the task.  Whether a defendant breached its duty of care and whether

---

[19]*Lewis*, 535 P.2d at 1196.

[20]*Belger,* 582 P.2d at 1122.

[21]*Franklin v. Nw. Drilling Co., Inc.*, 524 P.2d at 1202; *see also Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 26-27 (Alaska 1997) (recognizing that an equipment lease to provide a thermal remediation unit included an implied warranty that the equipment was fit for the work).

[22]*Pepsi Cola*, 427 P.2d at 839.

-7-

any breach caused the damages suffered is typically a factual question for a jury and not susceptible to resolution on a motion for summary judgment.[23] Plaintiff, however, asserts that no reasonable juror could conclude that the rig Cudd provided for the well workovers was suitable for the operations.

Plaintiff points to a variety of evidence in support. Deposition testimony confirms that Cudd chose the rig to send to Alaska after looking at CIE's well schematics and that Cudd intended to send a "big rig" to Alaska for the job. It cites evidence showing that Cudd chose its rig #138 as the rig to do the work and represented that the rig was similar to another one of its larger rigs that was being used in Cook Inlet for another oil production company. It points to evidence showing that Cudd intended the rig to have a 22,000 ft.-lbs. rotary head on it and in fact sent a rig with a 22,000 ft.-lbs. rotary head on it. It is undisputed that a rig with that size of rotary head on it should be able to produce up to 22,000 ft.-lbs. of torque.[24] It is undisputed that the rig "stalled out" without being able to reach the "fish" in well RU-3. The evidence shows it stalled out when the rig applied around 9,000 to 10,000 ft.-lbs. torque and that the most torque it was documented to have applied was 11,500 ft.-lbs. The evidence also shows that the rig was unable to fully remove the "fish" from well RU-1. Plaintiff also cites multiple affidavits and deposition testimony where CIE employees and agents assert that the rig could not produce sufficient torque or that, alternatively, Cudd's operator did not know how to get the rig to produce more torque. It is also undisputed that CIE completed the workover of RU-3 in 2012 using a rig not supplied by Cudd. CIE acknowledges that the rig it used to perform the subsequent workover was a "much larger drilling rig with

---

[23]*Lindsey v. E & E Auto. & Tire Serv., Inc.*, 241 P.3d 880, 885 (Alaska 2010).

[24]There is some evidence to suggest that the rig had a smaller rotary head on it. At some point during the negotiations and preparations with CIE, Cudd representatives sent rig specifications to CIE. The specifications for rig #138 show that it had only about 9,000 ft.-lbs. torque. However, deposition testimony of Cudd indicates that those rig specs were incorrect and that Cudd intended to send something with more torque to Alaska and did so. For purposes of this motion, the court presumes it did in fact have the 22,000 rotary head on it.

greater torque capacity than [Cudd's rig]," but asserts that the job was completed using between 18,000 to 20,000 ft.-lbs. of torque, which Cudd's rig should have been able to produce during the first workover attempt.[25]

In response, Cudd argues that the evidence does not show that, as a matter of undisputed fact, the rig, or its operation thereof, was defective. It contends that there is enough evidence in the record to put the issue of the rig's suitability or the operator's competency to the jury. The affidavit of Cudd's representative, Bobby Bray, states that it is "inherently difficult to know and understand the conditions that will be encountered [inside a well] until the job has begun" and that is why contracts for workover services are done on a time and material basis.[26] Cudd points to evidence to suggest that the rig was not the problem with the workover of RU-3, but rather, the operation was experiencing some other unexpected problems of an unknown nature. Cudd points to the daily logs completed by Baker Hughes, the company CIE hired to provide the fishing specialist for the workover. The logs suggest that the crew participating in the workover operations on RU-3 were uncertain as to what was causing the rig to stall out and were trying to troubleshoot the issues. Specifically, the daily logs indicate that the Baker Hughes' fishing specialist and the company representative for CIE overseeing the work on the platform thought they were on the "fish" and that they were "either splitting the fish or cutting casing."[27] The logs also contain a statement that an increase in torque was of "no help."[28] For purposes of this summary judgment motion, taking all inferences in favor of Cudd, this evidence lends support to Cudd's argument that other issues may have been causing the troubles with the workover of well RU-3.

---

[25] Doc. 82 at p. 33.

[26] Doc. 101-2 at pp. 2-3.

[27] Doc. 83-10 at p. 108 (Plaintiff's Ex. 39).

[28] Doc. 83-10 at p. 109 (Plaintiff's Ex. 39).

Cudd also argues that CIE never attempted increase the torque applied by the rig beyond 11,500 ft.-lbs. because of limitations on the drill pipe CIE was using for the well. Cudd relies on an entry in the Baker Hughes' daily logs again, which states that the fishing specialist for Baker Hughes asked Cudd's rig operator to increase torque to 11,500 ft.-lbs., that the rig was able to do so, and that he concluded that "more torque is no help."[29] Cudd argues, based on the affidavit of Cudd's representative Bobby Bray, that it would be industry standard to not push torque much beyond the 11,500 ft.-lbs. because the size of the drill pipe CIE was using for the well limited the amount of torque that could be applied by the rig.[30]

Plaintiff takes issue with Cudd's argument that a drill pipe limitation, not the rig's capability, was the reason for inadequate torque, arguing that 11,500 ft.-lbs. is far below the maximum torque CIE's drill pipe could withstand. It is undisputed that CIE's drill pipe was 3 ½ inches in diameter. The parties dispute what the torque limitation is for this size of drill pipe, but only CIE produced admissible evidence on which the court may rely. Based on CIE's evidence, the recommended torque that could be applied to that size of drill pipe was 13,200 ft.-lbs. and, with CIE's approval, the torque could have gone up to 16,500 ft.-lbs.[31] Plaintiff argues that it would make no sense to limit the torque to 11,500 ft.-lbs. when the limitation was at least 13,200 ft.-lbs. The court's job, however, is not to weigh the evidence or determine which parties' argument is stronger. Rather, the court must simply determine if there is any evidence from which a juror could possibly draw the opposite conclusion.

Plaintiff argues that there is no such evidence from which a juror could conclude otherwise. It asserts that the record does not contain a "scintilla of evidence to support Cudd's claim that [its rig] produced [less than] its maximum torque capability because

---

[29] Doc. 83-10 at p. 109 (Plaintiff's Ex. 39).

[30] 101-2 at p. 5.

[31] Doc. 79 at p. 3.

-10-

CIE made a decision to limit torque."[32] It argues that if the concern was with the drill pipe limitation there would have been a record of Cudd initiating such discussions, which there is not. Cudd, however, points to Bray's affidavit that states it is not industry standard for the rig operator to raise the issue of a drill pipe limitation with the drilling operations supervisor, but rather, the issue would be "a basic shared understanding of those working on the rig."[33] He also states that rigs with around 10,000 ft.-lbs. of torque capabilities are standard for well workovers,[34] which could suggest that no one expected to need more. Plaintiff argues that Bray cannot contradict his deposition testimony with his affidavit, but upon review of the deposition testimony Plaintiff relies on in support, the court concludes that his deposition testimony is not necessarily contrary. In his deposition, Bray acknowledged that if the drill pipe limitation had became a problem there would have been a conversation between the people working on site and that eventually CIE representatives would have contacted Cudd representatives about whether and how to exceed the limitation, and he acknowledges that no conversation to this effect took place, but he also states that it would have been the responsibility of the drill site supervisor to initiate discussions about increasing torque past a certain point.[35] Thus, Cudd has created an issue of fact about what the standard course of action should have been.

Plaintiff also argues that the rig operator admitted that he would have mentioned the drill pipe limitation if that had been preventing an increase in torque. In his deposition testimony, the rig operator acknowledges that if he had been concerned about going over torque limitation or if the fishing operations supervisor or well-owner representative wanted to go above the torque limitation he would have had a

---

[32]Doc. 108 at p. 23.

[33]Doc. 101-2 at p. 5.

[34]Doc. 101-2 at p. 4.

[35]Doc. 83-1 at p. 11 (Bray deposition pp. 44-45).

-11-

conversation with CIE's representatives on the platform,[36] but that does not rule out the possibility that the pipe limitations would have been universally understood or that the Baker Hughes' fishing specialist and CIE's company representative on the platform were the ones deciding how much torque to apply at the time of the workover. In other words, the operator's deposition testimony does not rule out the possibility that he was simply relying on the operational supervisors on site to tell him how high to increase the torque and that he just assumed that they did not want him going higher with the torque for a reason. As noted above, an entry in the Baker Hughes' daily logs indicates that the fishing specialist specifically asked the rig operator to increase torque to 11,500 ft.-lbs., which at least supports an argument that the other CIE agents on the platform were making decisions about how far to go with the torque. Therefore, even if the Baker Hughes' specialist disagrees with that assessment of the situation, the logs create a question of fact.

While the affidavit from the fishing specialist states that the rig stalled out continuously and that Cudd's rig operator could not get the rig to generate torque beyond 11,500 ft.-lbs., Cudd has at least put forward some evidence to suggest that the torque may have been purposefully limited at that point. It is undisputed that there was a drill pipe limitation that the parties would not want to exceed, there is evidence to suggest that the fishing specialist and CIE's on-site supervisor were involved in troubleshooting the problems and directed Cudd's rig operator to increase the rig's torque to 11,500 ft.-lbs., which he did. There is no specific record of a CIE agent asking the rig's operator to increase torque beyond 11,500 ft.-lbs. and that the rig failed to do so. The rig operator testified that the rig could have produced more torque.[37] Therefore, drawing all inferences in favor of Cudd, this evidence lends support to

---

[36]Doc. 83-6 at pp. 7-8 (Lirette deposition at pp. 38-45).

[37]Doc. 101-6 at p. 7 (Lirette deposition. at pp. 51-52).

-12-

Cudd's position that the rig's torque capability was not defective—that is, the rig's torque could have been increased.

Plaintiff argues that these questions of fact about whether the parties were limiting torque for a reason or whether the rig was defective are not relevant because, as a matter of law, Cudd's operator was not performing his duty when he failed to inform CIE that the drill pipe needed to be larger to increase the torque, which constitutes a breach apart from the suitability of the rig. In other words, Plaintiff argues that Cudd's warranty to perform in a workmanlike manner included a duty to warn CIE of any issues that prevented its rig from generating more torque.

In support, Plaintiff relies on Lewis v. Anchorage Asphalt Paving Co.[38] In *Lewis*, a paving contractor brought a breach-of-contract action against a property owner for payments in connection with paving, and the owner counterclaimed alleging that the paving was not done in a workmanlike manner. The parties had entered into an "end result" contract where the contractor was to "prepare the subgrade" and place suitable asphalt paving on top of the subgrade.[39] The warranty to perform in a workmanlike manner was expressly stated in the contract, but the court acknowledged that an implied warranty to perform in a workmanlike manner was coextensive with the express warranty in the contract.[40] The contractor performed the work, but the paving eventually started to fail. The expert testimony established that the paving failed because there was peat located under the existing subgrade. After hearing all the evidence on the meaning of the ambiguous term "prepare the subgrade," the lower court concluded that the scope of the contract was limited to shaping the subgrade that was already on site and providing quality materials for the paving; it did not include providing different or additional subgrade material under the paving to account for the peat in the soil. Thus,

---

[38] 535 P.2d 1188 (Alaska 1975).

[39] *Id.* at 1191-92, 1197.

[40] *Id.* at 1196.

-13-

the court concluded that the failed paving due to the underlying peat in the soil was not attributable to the contractor's improper performance of his contractual duties.[41]

On appeal, the Supreme Court of Alaska upheld the lower court's interpretation of the contract. It therefore concluded that the duty to perform the contract in a workmanlike manner only reached to the contractor's grading and shaping of the existing subgrade and the paving. It explained that the "end result" contract only meant that the contractor had to successfully grade and shape what was there and then pave over it with quality materials, which he did successfully. However, the court concluded that, as part of the duty to perform in a workmanlike manner, a contractor of an end result contract has a duty to provide notice to the owner, regardless of an owner's personal expertise, if the owner is calling for an end product under circumstances which the contractor knows or should know are bound to lead to failure.[42] Therefore, the contractor had a duty to warn the owner that a suitable result could not be obtained by placing the asphalt over the existing subgrade if he had known or should have known about the underlying peat.[43]

Plaintiff argues that based on *Lewis*, as part of its duty to perform in a workmanlike manner, Cudd had a duty to warn CIE, regardless of CIE's expertise, about the effect of the drill pipe limitation on the rig's torque. Plaintiff contends that because it is undisputed that Cudd did not do so, there is an undisputed breach of that duty. The court concludes that *Lewis's* holding does not extend to the situation presented here. The contract at issue in *Lewis* was an end result contract. The owner was calling for a specific end product from the contractor. In such a situation, if the contractor knows about a defect that would cause the contractor's end product to fail, even if the defect was not the contractor's fault or within the scope of the contract to fix,

---

[41]*Id.* at 1197.

[42]*Id.* at 1199.

[43]*Id.*

-14-

he has a duty to report that defect to the owner. The Alaska Supreme Court acknowledged that a similar duty to warn would exist under a "plans and specifications" contract where the contractor agrees to build according to detailed plans and specifications prepared by the owner. In such a situation, the contractor would have a duty to warn the owner if there are defects in the plans that the contractor must follow.[44] Here, the parties only had a time and materials contract. Plaintiff does not assert that the contract was any broader so that Cudd was obligated to provide a certain end result or follow specific plans for the operation. Moreover, in *Lewis* it was clearly established that a paving contractor would not, if operating under what is standard in the industry, place paving on subgrade consisting of peat without the use of a gravel base. Therefore, assuming he knew about the peat, the contractor was confronted with performing his duty to prepare the subgrade and provide quality materials in the face of a clear defect that would affect the contractor's performance of that duty. The same situation is not presented here. Cudd's contract was to provide a suitable rig and competent operators for the rig. There was no actual defect presented that would make the rig itself fail, and there are issues of fact as to what the standard practice is for a rig operator in regard to proceeding in the face of the owner's drill pipe limitation. Plaintiff has not provided any authority to demonstrate that the scope of Cudd's duty to perform in a workmanlike manner in these circumstances would, *as a matter of law*, include a duty to warn CIE about the effect of CIE's drill pipe on the workover project. Rather, the court finds that the issue is better addressed as a question of fact as to the issue of breach for the jury to decide.

There is other evidence in the record that prevents the court from taking the issues of fact regarding Cudd's breach and causation away from the jury here. The logs created by the Baker Hughes' representative during the course of the workover operations, as well as the daily logs created by CIE itself, do not clearly indicate that the

---

[44] *Id.* at 1198-99.

-15-

rig was suspected of being defective at the time.  Also, Cudd points to evidence that no complaints were lodged to Cudd's management about the performance of its rig or its operator.  Finally, the fact CIE paid Cudd for amounts owed on Cudd's first three invoices, which involved the time and materials spent on RU-3, supports an inference that CIE did not take issue with the rig's torque capabilities.[45]

Plaintiff also argues that Cudd breached an express warranty to provide a rig with up to 15,600 ft.-lbs. of torque.  It relies on an analysis Cudd conducted regarding whether its rigs could be used to drill CIE's proposed new wells.  That analysis concluded that the rig would need to be able to produce as much as 15,600 ft.-lbs. of torque.  Even though the parties never agreed that the rig would be used to drill the new sidetrack wells, Plaintiff points to deposition testimony to show that Cudd nonetheless believed the rig could do so.  Aside from the uncertainty as to whether Cudd's analysis constituted a promise about the rig's torque capabilities and whether CIE expected that much torque and relied on such a promise, as stated above, there are issues of fact as to how much torque the rig could generate.

## V.  CONCLUSION

Based on the preceding discussion, Plaintiff's motion for partial summary judgment at docket 141 is DENIED.

DATED this 29th day of November 2016.

/s/ JOHN W. SEDWICK
SENIOR JUDGE, UNITED STATES DISTRICT JUDGE

---

[45]Doc. 82-6 (Plaintiff's Ex. F).